# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

TONI B.,                          )
                                  )
            Plaintiff,            )
                                  )
     v.                           )         1:24CV788
                                  )
FRANK J. BISIGNANO,               )
Commissioner of Social            )
Security,                         )
                                  )
            Defendant.[1]         )

## MEMORANDUM OPINION AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Toni B., brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security (the "Commissioner"), denying Plaintiff's claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Docket Entry 1.) The Commissioner has filed the certified administrative record (Docket Entry 6 (cited herein as "Tr. __")), and both parties have submitted dispositive briefs in accordance with Rule 5 of the Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g) (Docket Entry 9 (Plaintiff's Brief); Docket Entry 11 (Commissioner's Brief); Docket

---

[1] The United States Senate confirmed Frank J. Bisignano as the Commissioner of the Social Security Administration on May 6, 2025, and he took the oath of office on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank J. Bisignano should substitute for Martin J. O'Malley as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Entry 12 (Plaintiff's Reply)).  For the reasons that follow, the Court will remand this matter for further administrative proceedings.[2]

## I.  PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI (Tr. 206-16), alleging a disability onset date of October 2, 2020 (see Tr. 206, 209).  Upon denial of those applications initially (Tr. 75-96, 145-54) and on reconsideration (Tr. 97-132, 156-63), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 164-65).  Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing.  (Tr. 37-74.)  The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act.  (Tr. 11-36.)  The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 204-05, 337-38), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings later adopted by the Commissioner:

> 1.  [Plaintiff] meets the insured status requirements of the . . . Act through June 30, 2027.
>
> 2.  [Plaintiff] engaged in substantial gainful activity during the following periods: fourth quarter of 2021.
>
> . . . The [ALJ] does not find this work to disqualify [Plaintiff] on the technical grounds of the first step of the sequential evaluation process.

---

[2] On consent of the parties, this "case [wa]s referred to [the undersigned] United States Magistrate Judge . . . to conduct all proceedings . . ., to order the entry of judgment, and to conduct all post-judgment proceedings []herein."  (Docket Entry 10 at 1.)

3. . . . [T]here has been a continuous 12-month period(s) during which [Plaintiff] did not engage in substantial gainful activity. The remaining findings address the period(s) [Plaintiff] did not engage in substantial gainful activity.

4. [Plaintiff] has the following severe impairments: bilateral carpal tunnel syndrome, status post right carpal tunnel release; obesity; osteoarthritis of the bilateral hips.

. . .

5. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

6. . . . [Plaintiff] has the residual functional capacity to perform light work . . . except she can: occasionally climb ladders, ramps, and scaffolds; frequently climb ramps and stairs, and balance; and can perform frequent but not constant handling and feeling with the bilateral upper extremities.

. . .

6. [Plaintiff] is capable of performing past relevant work as a phlebotomist, medical assistant, and EKG technician as generally performed. This work does not require the performance of work-related activities precluded by [Plaintiff]'s residual functional capacity.

. . . In addition to past relevant work, there are other jobs that exist in significant numbers in the national economy that [Plaintiff] can perform, considering [her] age, education, work experience, and residual functional capacity. . . .

3

8.   [Plaintiff] has not been under a disability, as defined in the . . . Act, from October 2, 2020, through the date of th[e ALJ's] decision.

(Tr. 16-29 (bold font and internal parenthetical citations omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits."  <u>Hines v. Barnhart</u>, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope of . . . review of [such a] decision . . . is extremely limited."  <u>Frady v. Harris</u>, 646 F.2d 143, 144 (4th Cir. 1981).  Even given those limitations, the Court will remand this case for further administrative proceedings.

## A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo."  <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).  Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard."  <u>Hines</u>, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  <u>Hunter v. Sullivan</u>, 993 F.2d 31, 34 (4th Cir. 1992) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 390 (1971)).  "It consists of

4

more than a mere scintilla of evidence but may be somewhat less than a preponderance."  Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted).  "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence."  Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]."  Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted).  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)."  Id. at 179 (internal quotation marks omitted).  "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law."  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any

5

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174

---

[3] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. [SSI] . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

F.3d 473, 475 n.2 (4th Cir. 1999).[4]  A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry.  For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.'  If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not, benefits are denied."  Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled."  Mastro, 270 F.3d at 177.  Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]."  Id. at 179.[5]  Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant  work"; if so, the claimant does not qualify as disabled.  Id. at 179-80.  However, if the

_____

    [4] "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the [government] . . . ."  Hunter, 993 F.2d at 35 (internal citations omitted).

    [5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations."  Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)."  Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)."  Hines, 453 F.3d at 562-63.

7

claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65.  If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled.  Hines, 453 F.3d at 567.[6]

### B.  Assignment of Error

In Plaintiff's first and only issue on review, she maintains that "[t]he ALJ improperly evaluated the opinion evidence which supported greater limitations than [s]he assessed."  (Docket Entry 9 at 4 (block formatting omitted); see also Docket Entry 12 at 1-9.)  More specifically, Plaintiff (A) contends that "[t]he ALJ found each opinion related to [Plaintiff]'s mental impairments to be non-persuasive, or only partially persuasive" (Docket Entry 9 at 12), including those of the state agency psychological consultants (see id. (citing Tr. 24)), treating psychiatrist Dr. Jonathan Stoudmire (see id. at 12-13 (citing Tr. 25)), treating counselor

---

[6] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five.  Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis.  See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

Christina Hudgins Motley, MA, LCMHCA, RDMT ("Counselor Motley") (see id. at 13 (citing Tr. 25)), consultative psychological examiner Dr. Philip Hatfield (see id. at 13-14 (citing Tr. 26)), and consultative psychological examiner Dr. J. Craig Hunt (see id. at 14 (citing Tr. 26)), and (B) alleges that those "findings are unreasonable and cannot be found to be supported by substantial evidence" (id.). Plaintiff further (A) asserts that "[t]he ALJ found each opinion related to [Plaintiff]'s manipulative limitations to be non-persuasive, or only partially persuasive" (id. at 23), including those of the state agency medical consultants (see id. at 24 (citing Tr. 24)), treating hand surgeon Dr. Karl Edward Bolstad (see id. at 24-25 (citing Tr. 24-25)), and consultative medical examiner Dr. Stephen Burgess (see id. at 25 (citing Tr. 25)), and (B) argues that those "findings are unreasonable" (id.). In Plaintiff's view, "remand is warranted to allow for a proper evaluation of the opinion evidence, which will affect the ALJ's evaluation of [Plaintiff]'s subjective complaints and [the] resulting RFC determination." (Id. at 26-27.) For the reasons explained in more detail below, Plaintiff's contentions have merit and warrant remand.

For benefits applications filed on or after March 27, 2017, such as Plaintiff's (see Tr. 206-16), the SSA has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. See Revisions to Rules Regarding the

Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017).  Under the new regulations, ALJs need not assign an evidentiary weight to medical opinions or accord special deference to treating source opinions.  <u>See</u> 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[7]  Instead, an ALJ must determine and "articulate in [the] . . . decision how <u>persuasive</u> [he or she] find[s] all of the medical opinions and all of the prior administrative medical findings in [a claimant's] case record."  20 C.F.R. §§ 404.1520c(b), 416.920c(b) (emphasis added).  Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually."  20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1).

---

[7] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental, or other demands of work activity or to adapt to environmental conditions.  20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2) (2017).  Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review."  20 C.F.R. §§ 404.1513(a)(5), 416.913(a)(5) (2017).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors" and thus the ALJ must address those two factors in evaluating the persuasiveness of an opinion or a finding. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).[8] The ALJ must only address the three other persuasiveness factors — the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict" the opinion/finding, 20 C.F.R. §§ 404.1520c(c)(3)-(5), 416.920c(c)(3)-(5) — when the ALJ finds two or more opinions or findings about the same issue "[e]qually persuasive" in terms of supportability and consistency, 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)3).

1.   Opinions Relating to Plaintiff's Mental Impairments

a.   State Agency Psychological Consultants

At the initial level of review, the state agency psychological consultant found that Plaintiff's mental impairments qualified as severe (see Tr. 77, 87), and opined that those impairments caused "mild" limitation in her abilities to understand, remember, or apply information and to interact with others, "moderate"

---

[8] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; see also 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; see also 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

11

limitation in her ability to concentrate, persist, or maintain pace ("CPP"), and no limitation in her ability to adapt or self-manage (Tr. 78, 88). As a result of those limitations, the consultant found Plaintiff moderately limited in several abilities connected to CPP (see Tr. 82, 92), but opined that she "appear[ed] able to meet the mental demands of basic work activity" and did not provide any specific mental RFC limitations (Tr. 78, 82, 88, 92). At the reconsideration level, the state agency psychological consultant also found Plaintiff's mental impairments severe (see Tr. 103, 120) and opined that those impairments caused "mild" limitation in Plaintiff's ability to understand, remember, or apply information, "moderate" limitation in her abilities to interact with others and to maintain CPP, and no limitation in her ability to adapt or self-manage (Tr. 104, 121). The consultant observed that Plaintiff "would clearly have difficulty performing consistent [substantial gainful activity ('SGA')] in any high-stress setting or a job in which conflict might factor regularly (such as a collections call center)," and thus limited Plaintiff to "[simple, routine, and repetitive tasks ('SRRTs') in a low-stress, stable setting." (Id.; see also Tr. 111, 128 (predicting "difficulty maintaining CPP in a high-stress setting" and "mild to moderate difficulties with social interaction").)

Notwithstanding the differences between those opinions, the ALJ evaluated the opinions of the initial and reconsideration level

12

psychological consultants together and assigned them a single persuasiveness value, as follows:

> The mental assessments of [the state agency psychological consultants] found [Plaintiff]'s mental impairments severe with some moderate limitations. The [ALJ] finds these opinions are not persuasive because evidence received at the hearing level does not support severe mental impairment. [Plaintiff] testified she returned to work during a portion of the relevant time period. Mental health records note [Plaintiff] reported experiencing motivation to engage [sic] day to day life tasks and increasing work time and also reported mood stability and described her mood as happy. She denied flashbacks, feeling nervous or having panic attacks. Recent records note [Plaintiff]'s report that she feels "relieved, happy" and feeling "pretty good, taking care of myself" in the present moment ([Tr. 588-94; 605-06, 608-09, 616, 644, 649, 651, 658-59, 661-67, 744, 799, 801, 803, 805, 807, 813]). [Plaintiff] indicated she stopped taking some of her prescribed psychotropic medications on her own. The treatment notes of her treating practitioners usually showed that [Plaintiff]'s mental status was normal at appointments ([Tr. 351, 353, 377, 380, 383, 388, 392, 502, 596, 598, 600, 606, 610, 744, 748]).

(Tr. 24.)

b.   Dr. Stoudmire

Dr. Stoudmire completed a preprinted form entitled "Mental Capacity Assessment" on January 29, 2021 ("Stoudmire Assessment"). (Tr. 512-14.)  The Stoudmire Assessment failed to list any mental disorders in the space requesting "[d]iagnoses" (Tr. 512), and also left blank all of the spaces for "[d]escribing the medical/clinical findings that support[ed] th[e A]ssessment" (id.; see also Tr. 513-14).  According to Dr. Stoudmire, Plaintiff's unidentified mental impairments would cause no limitation in her "ability to follow

13

one- or two-step oral instructions to carry out a task" (Tr. 512), and "[u]nknown" limitation in the remaining abilities relating to "understanding, remembering or applying information" (id. (all-caps font omitted)), no limitation in her "ability to initiate and perform a task [Plaintiff] knows how to do" (Tr. 513), "[m]ild" limitation in her "ability to ignore or avoid distractions while working" (id.), and "[u]nknown" limitations in the remaining abilities concerning CPP (id. (all-caps font omitted)), no limitation in her "ability to be aware of normal hazards and take appropriate precautions" (id.), "[m]ild" limitation in her "ability to manage psychologically based symptoms" and "ability to maintain personal hygiene and attire appropriate to a work setting" (id.), and "[u]nknown" limitation in the rest of the abilities regarding "adapting or managing oneself" (id. (all-caps font omitted)), and "[m]ild" limitation in her "ability to cooperate with others or ask for help when needed," "ability to handle conflicts with others," "ability to understand and respond to social cues," and "ability to respond to requests, suggestions, criticism, correction and challenges," and "[m]oderate" limitation in her "ability to keep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness" (Tr. 514).

The ALJ provided the following evaluation of the persuasiveness of the Stoudmire Assessment:

14

> [Dr.] Stoudmire[] issued [the Stoudmire Assessment] and opined [Plaintiff] has <u>no more than mild</u> limitations in interacting with others; adapting and managing oneself; [CPP]; and understanding, remembering, or applying information ([Tr. 512-14]). The [ALJ] finds this opinion partially persuasive to the extent that is consistent with non severe mental impairment, which is supported by the objective medical evidence. Mental health records note [Plaintiff] reported experiencing motivation to engage [sic] day to day life tasks and increasing work time and also reported mood stability and described her mood as happy. She denied flashbacks, feeling nervous or having panic attacks. Recent records note [Plaintiff]'s report that she feels "relieved, happy" and feeling "pretty good, taking care of myself" in the present moment ([Tr. 588-94; 605-06, 608-09, 616, 644, 649, 651, 658-59, 661-67, 744, 799, 801, 803, 805, 807, 813]). [Plaintiff] indicated she stopped taking some of her prescribed psychotropic medications on her own. The treatment notes of her treating practitioners usually showed that [Plaintiff]'s mental status was normal at appointments ([Tr. 351, 353, 377, 380, 383, 388, 392, 502, 596, 598, 600, 606, 610, 744, 748]).

(Tr. 25 (emphasis added).)[9]

c. Counselor Motley

Counselor Motley submitted a letter to Plaintiff's attorney dated April 8, 2021, on which Counselor Motley stated Plaintiff had received outpatient therapy and medication management at the Center for Emotional Health since January 7, 2021, and that Plaintiff's diagnoses included major depressive disorder, post-traumatic stress disorder ("PTSD"), bipolar disorder, obsessive-compulsive disorder ("OCD"), and panic disorder. (Tr. 584.) Counselor Motley

---

[9] The ALJ erred when she stated that "[Dr.] Stoudmire[] . . . opined [Plaintiff] has <u>no more than mild</u> limitations in [her mental functioning]." (Tr. 26 (emphasis added).) Dr. Stoudmire, in fact, opined that Plaintiff had "<u>moderate</u>" limitation in her "ability to keep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness." (Tr. 514 (emphasis added).)

15

indicated that "the specific symptoms impacting [Plaintiff]'s ability to function at her maximum capacity include[d] an increase in severe panic attacks, manic episodes, depressed mood, significant sleep disturbances, low motivation, social isolation, hopelessness, feelings of worthlessness, difficulty concentrating, loss of interest in enjoyable activities, guilt, grief, hypervigilance, excessive worrying, and catastrophic thinking." (Id.) According to Counselor Motley, "[a] majority of [Plaintiff's] symptoms began during childhood increasing in severity through adulthood, due to a series of exposure to complex traumatic experiences that she ha[d] survived[,] . . . includ[ing] instances of physical abuse, sexual abuse, and emotional abuse." (Id.) In Counselor Motley's opinion, "[d]ue to the severity of [Plaintiff's] symptoms[, she] ha[d] been unable to return to her place of work" and, although "[s]he continue[d] to make significant improvements, . . . she [wa]s still not at a place where she [wa]s sufficiently stable to maintain employment." (Id.) Counselor Motley therefore "request[ed] disability benefits." (Id.)

The ALJ provided the following evaluation of Counselor Motley's opinions:

> The [ALJ] finds [Counselor Motley's] opinion [sic] as the objective medical evidence does not support such limitations. In addition, the issue of disability is reserved to the Commissioner. Mental health records note [Plaintiff] reported experiencing motivation to engage [sic] day to day life tasks and increasing work time and also reported mood stability and described her mood as happy. She denied flashbacks, feeling nervous or having

16

> panic attacks. Recent records note [Plaintiff]'s report that she feels "relieved, happy" and feeling "pretty good, taking care of myself" in the present moment ([Tr. Tr. 588-94; 605-06, 608-09, 616, 644, 649, 651, 658-59, 661-67, 744, 799, 801, 803, 805, 807, 813]). [Plaintiff] indicated she stopped taking some of her prescribed psychotropic medications on her own. The treatment notes of her treating practitioners usually showed that [Plaintiff]'s mental status was normal at appointments ([Tr. 351, 353, 377, 380, 383, 388, 392, 502, 596, 598, 600, 606, 610, 744, 748]).

(Tr. 25.)[10]

d. Dr. Hatfield

Dr. Hatfield conducted a consultative psychological evaluation of Plaintiff on June 15, 2021 (Tr. 588-93), at which he diagnosed her with chronic PTSD, bipolar disorder type I, recurrent and severe major depressive disorder without psychotic features, borderline personality disorder, and obsessive-compulsive traits (see Tr. 593). As a result of those impairments, Dr. Hatfield opined that Plaintiff "appear[ed] to be generally capable of understanding, retaining and following simple, concrete instructions without difficulty" (Tr. 592), "w[ould] likely have moderate difficulties utilizing sustained attention to perform routine, repetitive tasks" (id.), "appear[ed] easily overwhelmed and tend[ed] to give up easily even on less difficult problem solving tasks" (id.), "[wa]s likely to have moderate difficulties forming and maintaining effective forming [sic] working

---

[10] The ALJ erred by failing to include a specific persuasiveness finding in her evaluation of Counselor Motley's opinions. (See Tr. 25.)

17

relationships with co-workers and supervisors, and the general public" (id.), and "[wa]s likely to have moderate difficulties tolerating the usual stress and pressures of a competitive workplace, including managing changes in the routine" (Tr. 592-93).

The ALJ summarized Dr. Hatfield's opinions (see Tr. 25-26), and then appraised them as follows:

> The [ALJ] finds the opinion of Dr. Hatfield not persuasive as it is based on [sic] one time evaluation of [Plaintiff] and appears to be based primarily on [Plaintiff]'s subjective reports, rather than the objective evidence. [Plaintiff] testified she returned to work during a portion of the relevant time period. Mental health records note [Plaintiff] reported experiencing motivation to engage [sic] day to day life tasks and increasing work time and also reported mood stability and described her mood as happy. She denied flashbacks, feeling nervous or having panic attacks. Recent records note [Plaintiff]'s report that she feels "relieved, happy" and feeling "pretty good, taking care of myself" in the present moment ([Tr. Tr. 588-94; 605-06, 608-09, 616, 644, 649, 651, 658-59, 661-67, 744, 799, 801, 803, 805, 807, 813]). [Plaintiff] indicated she stopped taking some of her prescribed psychotropic medications on her own. The treatment notes of her treating practitioners usually showed that [Plaintiff]'s mental status was normal at appointments ([Tr. 351, 353, 377, 380, 383, 388, 392, 502, 596, 598, 600, 606, 610, 744, 748]).

(Tr. 26.)

e.  Dr. Hunt

Just over a year after Dr. Hatfield's examination, Plaintiff underwent a second consultative psychological examination by Dr. Hunt on July 13, 2022. (Tr. 661-66.) Dr. Hunt diagnosed Plaintiff with PTSD, recurrent and moderate major depressive disorder, and generalized anxiety disorder. (See Tr. 665.) As a result of those

18

impairments, Dr. Hunt believed that Plaintiff "appeared to have the intellectual capacity to perform [SRRTs] as well as to understand, retain, and follow instructions," "could have moderate difficulty interacting effectively with peers, coworkers, and supervisors due to complications from mood and anxiety," "demonstrated adequate [CPP] based on her mental status response," and "could have moderate to marked difficulty tolerating the stress associated with day-to-day work activity due to the depletion of coping resources related to chronic pain and underdeveloped coping resources given her history of chronic mental health concerns." (Tr. 666.)

The ALJ described Dr. Hunt's above-quoted opinions (see Tr. 26), and then assessed them in the following manner:

> The [ALJ] finds the opinion of Dr. Hatfield [sic] not persuasive as it is based on [sic] one time evaluation of [Plaintiff] and appears to be based primarily on [Plaintiff]'s subjective reports, rather than the objective evidence. [Plaintiff] testified she returned to work during a portion of the relevant time period. Mental health records note [Plaintiff] reported experiencing motivation to engage [sic] day to day life tasks and increasing work time and also reported mood stability and described her mood as happy. She denied flashbacks, feeling nervous or having panic attacks. Recent records note [Plaintiff]'s report that she feels "relieved, happy" and feeling "pretty good, taking care of myself" in the present moment ([Tr. 588-94; 605-06, 608-09, 616, 644, 649, 651, 658-59, 661-67, 744, 799, 801, 803, 805, 807, 813]). [Plaintiff] indicated she stopped taking some of her prescribed psychotropic medications on her own. The treatment notes of her treating practitioners usually showed that [Plaintiff]'s

19

> mental status was normal at appointments ([Tr. 351, 353, 377, 380, 383, 388, 392, 502, 596, 598, 600, 606, 610, 744, 748]).

(Id.)[11]

Plaintiff contests the ALJ's evaluation of that mental health opinion evidence on multiple grounds. (See Docket Entry 9 at 14-18.) As the following analysis will show, four of those grounds have merit and collectively require remand.

To begin, Plaintiff objects to the ALJ's rationale for discounting the opinions of the state agency psychological consultants, Dr. Hatfield, and Dr. Hunt on the grounds that "[Plaintiff ] return[ed] to work during a portion of the relevant period." (Id. at 14 (referencing Tr. 24, 26).) In Plaintiff's view, "[her] return to work was short-lived" (id. at 14-15), "she was having difficulty on [sic] performing the services" (id. at 15 (citing Tr. 50)) and "she had to 'take personal time, calling out of work or [she ] left early on occasion' due to her mental health" (id. (quoting Tr. 58-59)).

The Commissioner's regulations expressly recognize that ALJs may consider work performed by claimants after their alleged onset dates in determining their RFC and, ultimately, whether they qualify as disabled, see 20 C.F.R. §§ 404.1571, 416.971 ("The work,

---

[11] The ALJ's analysis of Dr. Hunt's opinions uses identical language to the ALJ's evaluation of Dr. Hatfield's opinions, including even the use of Dr. Hatfield's name instead of Dr. Hunt's. (See Tr. 26.) Thus, the ALJ likely cut and pasted her analysis of Dr. Hatfield's opinions for the analysis of Dr. Hunt's opinions. On remand, the ALJ should make sure to give each evaluation of opinion evidence an individualized assessment.

20

without regard to legality, that [a claimant] ha[s] done during any period in which [he or she] believe[s he or she is] disabled may show that [he or she is] able to work at the [SGA] level."), a fact long recognized by the United States Court of Appeals for the Fourth Circuit, Sigmon v. Califano, 617 F.2d 41, 42-43 (4th Cir. 1980) ("The general rule is one amply supported by common sense: the [Commissioner] can consider work done by the claimant after the alleged onset of disability as tending to show that the claimant was not then disabled."). Indeed, even when a claimant's post-onset work activity falls below SGA level, ALJs may consider whether the ability to engage in that sub-SGA work nevertheless conflicts with a claimant's allegations of disability. See 20 C.F.R. §§ 404.1571, 416.971 ("Even if the work [a claimant] ha[s] done was not [SGA], it may show that [he or she is] able to do more work than [he or she] actually did.").

Here, Plaintiff testified that she worked cutting men's hair from June 2021 to June 2022 (see Tr. 48-49), and that she "was only working six hours a week[ d]ue to [her] limitations, [and] scheduling when [she] was needed" (Tr. 50; see also Tr. 54). Plaintiff also indicated that, after her carpal tunnel release surgery, "[she was] unable to hold onto [her] clippers and [her] trimmers[, because t]he vibration cause[d her] hands to burn[ and] ma[de] it very difficult to hold onto things." (Tr. 53.) Plaintiff additionally stated that, "[a]fter a while, as far as

21

scheduling, . . . they had no room for [her, a]nd she was having difficulty on [sic] performing the services." (Tr. 50.) Plaintiff further testified that her mental health "[o]ccasionally" impacted her job, and that "[she ] had to take personal time, calling out of work or [she ] left early on occasion due to [mental health symptoms]." (Tr. 59 (emphasis added).)

The ALJ expressly found as follows regarding Plaintiff's post-onset work activity:

> [Plaintiff] worked after the alleged onset date. She earned $747.00 in the second quarter of 2021; $913.00 in the third quarter of 2021; $3379.00 in the first quarter of 2022; $798.00 in the second quarter of 2022 . . . In order for work in 2021 to be considered [SGA], wages must be at or in excess of $1310.00 per month. In order for work in 2022 to be considered [SGA], wages must be at or in excess of $1350.00 per month. As [Plaintiff]'s wages were not sufficient to be considered substantial, the [ALJ] finds this work was not [SGA].
>
> [Plaintiff] worked in the fourth quarter of 2021 for Top Cuts cutting men's hair. She earned $5113.00 in the fourth quarter of 2021 at this work. In the year 2021 wages at or in excess of $1310.00 per month are considered [SGA]. As [Plaintiff] earned substantial wages at gainful work, th[e ALJ] finds [Plaintiff] was engaged in [SGA]. The [ALJ] does not find this work to disqualify [Plaintiff for benefits] on the technical grounds of the first step of the [SEP].

(Tr. 16-17 (internal parenthetical citations omitted).) Thus, the ALJ found that Plaintiff's post-onset work activity in 2021 and 2022 primarily fell below SGA levels, with the exception of the fourth quarter of 2021, and, thus, concluded that such work did not disqualify Plaintiff for benefits. (See id.; see also Tr. 232 (reflecting total earnings for 2021 as $7,774.04 and for 2022 as

22

$4,177.43).) The ALJ did, however, (as quoted above) cite Plaintiff's work in 2021 and 2022 cutting hair as one basis among many to discount the opinions of the state agency psychological consultants, Dr. Hatfield, and Dr. Hunt. (See Tr. 24, 26 ("[Plaintiff] testified she returned to work during a portion of the relevant time period.").)

The ALJ did not err by relying, in part, on Plaintiff's post-onset work activity to discount the mental health opinions in question. Not only do the regulations and long-standing Fourth Circuit authority permit such reliance, see 20 C.F.R. §§ 404.1571, 416.971; see also Sigmon, 617 F.2d at 42–43, but the evidence recounted above demonstrates that Plaintiff worked part time cutting hair for approximately one full year, and that Plaintiff testified that her symptoms from her bilateral CTS and carpal tunnel release constituted the primary reason Plaintiff struggled to complete the work (see Tr. 50, 53-54). Indeed, Plaintiff testified that her mental symptoms interfered with her work performance only "[o]ccasionally." (Tr. 59.) Thus, Plaintiff's ability to work for a full year, even part time, with only "[o]ccasional[]" interference from mental symptoms (id.), undermined to some degree the opinions at issue, which all found that Plaintiff had more severe mental limitations than the ALJ found (compare Tr. 18-19, with Tr. 77-78, 81-82, 87-88, 91-92, 103-04, 109-11, 120-121, 126-28, 512-14, 584, 588-93, 661-66).

23

That rationale by the ALJ, under the circumstances of this case, does not constitute error.  See Atwell v. Saul, No. 6:19CV894, 2020 WL 5835126, at *4 (D.S.C. Oct. 1, 2020) (unpublished) ("[T]he ALJ [] relied on the fact that the extreme limitations opined by [the treating physician] were [] inconsistent with [the plaintiff's] work activity, as he continued to work on or after the alleged onset date . . . .  The . . . ALJ's consideration of [the plaintiff]'s work activity after his disability onset date was proper." (internal quotation marks, ellipsis, and citation omitted) (citing Sigmon, 617 F.2d at 42-43)); Lewis v. Berryhill, No. 6:16CV1, 2017 WL 887111, at *3 (W.D. Va. Mar. 6, 2017) (unpublished) ("[T]he ALJ noted that [the plaintiff] returned to work [after the alleged onset date] as a production worker, which demonstrated that she believed herself capable of working during the relevant timeframe.  Although [the plaintiff] ultimately quit that job four months later, the Commissioner can consider work done by the [plaintiff] after the alleged onset of disability as tending to show that the [plaintiff] was not then disabled." (internal quotation marks and citation omitted)); Redditt v. Colvin, No. 7:13CV391, 2014 WL 2800820, at *7 (W.D. Va. June 18, 2014) (unpublished) ("The ALJ [] specifically — and properly — noted that [the plaintiff] had repeatedly worked during the period of his alleged disability.  [The plaintiff]'s counsel suggests that [the plaintiff's] attempts to work should be interpreted in his favor,

24

*i.e.*, that he tried to find work to perform but was unable to work for any length of time due to his impairments. But the ALJ interpreted those attempts at work as evidence that undermined [the plaintiff's] claims of disability, consistent with the Commissioner's own regulations and Fourth Circuit authority." (internal citations omitted) (citing 20 C.F.R. §§ 404.1571, 416.971, and Sigmon, 617 F.2d at 42–43)); Blair v. Astrue, No. 5:10CV00112, 2012 WL 625001, at *4 (W.D. Va. Feb. 24, 2012) (unpublished) ("While this work attempt does not constitute [SGA], the ALJ's consideration of [the plaintiff]'s work during the relevant time period for purposes of assessing her credibility is permissible under the regulations." (citing 20 C.F.R. §§ 404.1571, 416.971)); Edrwin v. Astrue, No. 3:09CV679, 2010 WL 6243333, at *4 (E.D. Va. May 21, 2010) (unpublished) ("Though the employment did not rise to the level of SGA, the evidence could still be considered to demonstrate that a claimant is able to perform more work than the claimant did perform."), recommendation adopted, 2011 WL 1086473 (E.D. Va. Mar. 23, 2011) (unpublished); Cintron v. Astrue, No. 3:09CV44, 2010 WL 691219, at *15 (N.D.W. Va. Feb. 23, 2010) (unpublished) ("The ALJ properly considered [the p]laintiff's unsuccessful work attempt in addition to the other evidence in determining that her allegations of disability were not completely credible."); Phares v. Commissioner of Soc. Sec., No. 3:07CV90, 2008 WL 2026097, at *15 (N.D.W. Va. May 9, 2008) (unpublished)

25

(holding that, even if work does not qualify as SGA, ALJ may "still properly consider[ such work] in evaluating the credibility of [the p]laintiff's subjective pain and limitations").

Next, Plaintiff contends that "[t]he ALJ's notation of [Plaintiff] stopping medications does not support the ALJ's rejection of the consistent opinion[s] of [mental] limitations." (Docket Entry 9 at 15 (referencing Tr. 24-26).)  In that regard, Plaintiff points out that "the only notation in the records cited by the ALJ pertaining to stopping medications noted that [Plaintiff] was currently on paroxetine and that 'Past Psychiatric [M]edications: Citalopram 60 mg - stopped b[ecause] it was no longer relieving symptoms after 15 years.'"  (Id. (quoting Tr. 652, 658).)

As an initial matter, the ALJ failed to cite to any record evidence to support her assertion that  "[Plaintiff] indicated she stopped taking some of her prescribed psychotropic medications on her own."  (Tr. 24-26.)  However, the record does contain multiple instances (beyond the reference to discontinuance of "[c]italopram" noted by Plaintiff (Docket Entry 9 at 15 (quoting Tr. 652, 658))) of Plaintiff stopping (or failing to start taking) psychotropic medications on her own (see Tr. 381 (reflecting that Plaintiff took only anxiety medication and Vitamin D, and "ch[ose] not to take o[the]r med[ications]"), 389 (documenting that Plaintiff took only antidepressants and "forgot[]" to take other medications), 612

26

(recording that Plaintiff had been off her psychiatric medications for three days), 746 (indicating that Plaintiff had "forg[otten]" to take Trintellix), 756 (reporting that Plaintiff "mistakenly abruptly discontinued [l]amictal and Paxil"), 768 (noting that Plaintiff had run out of her psychiatric medications again), 772 (stating that Plaintiff remained out of her mental health prescriptions and had not taken any of them), 811 (containing report that, despite plan to start Trintellix, Plaintiff had not started that medication, but took Paxil instead)), which would ordinarily provide sufficient support for the ALJ's rationale that Plaintiff stopped taking psychiatric medications on her own (see Tr. 24-26).

In this case, however, (although not argued by Plaintiff (see Docket Entries 9, 12)) the record also reflects that Plaintiff, at times, stopped taking her psychiatric medications because she could not afford them. (See Tr. 283 (containing statement of Plaintiff's mother that Plaintiff "needs help or reminders taking medicine" because "she . . . doesn't have the money to get it"), 768 (reflecting that Plaintiff "[wa]s out of [psychiatric] medications once again due to lack of funds," and that "[Plaintiff] ha[d] high copays and [was] unable to keep up with [follow-up] with app[ointment]s" (emphasis added)).) The Fourth Circuit has held that "[a] claimant may not be penalized for failing to seek treatment she cannot afford," because "'[i]t flies in the face of

27

the patent purposes of the . . . Act to deny benefits to someone . . . too poor to obtain medical treatment that may help him.'" Lovejoy v. Heckler, 790 F.2d 1114, 1117 (4th Cir. 1986) (quoting Gordon v. Schweiker, 725 F.2d 231, 237 (4th Cir. 1984)).

An administrative ruling further expounds on an ALJ's duties when a claimant alleges an inability to afford treatment as follows:

> . . . [I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, . . . [the ALJ] may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. [The ALJ] will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not . . . seek treatment consistent with the degree of his or her complaints. [The ALJ] may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not . . . sought treatment in a manner consistent with his or her complaints. When [the ALJ] consider[s] the individual's treatment history, [the ALJ] may consider (but [is] not limited to) one or more of the following:
>
> . . .
>
> An individual may not be able to afford treatment and may not have access to free or low-cost medical services.
>
> . . .
>
> [An ALJ] will consider and address reasons for not pursuing treatment that are pertinent to an individual's case. [The ALJ] will review the case record to determine whether there are explanations for inconsistencies in the individual's statements about symptoms and their effects, and whether the evidence of record supports any of the individual's statements at the time he or she made them. [The ALJ] will explain how [he or she] considered the

> individual's reasons in [the ALJ's] evaluation of the individual's symptoms.

Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at *9-10 (Oct. 25, 2017) ("SSR 16-3p") (emphasis added) (bullet omitted).

The ALJ here discounted all of the mental health opinion evidence, in part, because "Plaintiff indicated that she stopped taking some of her prescribed psychotropic medications on her own" (Tr. 24-26), but the ALJ did not even acknowledge, much less "explain how [she] considered[, Plaintiff's inability to afford treatment] in [the ALJ's] evaluation of the [mental opinion evidence]," SSR 16-3p, 2017 WL 5180304, at *10. The ALJ erred in so doing. See Howe v. Kijakazi, No. 7:22CV66, 2023 WL 5363719, at *5 (E.D.N.C. July 31, 2023) (unpublished) ("[I]n the RFC discussion, the ALJ focused on [the plaintiff]'s medication noncompliance as an exacerbating factor in her repeated relapses. However, the ALJ failed to consider why [the plaintiff] was noncompliant with her medications. This was error . . . . SSR 16-3p requires the ALJ to consider possible reasons for failure to comply with treatment before finding an individual's symptoms inconsistent with the evidence of record on that basis. There is [] evidence in the record that indicates [the plaintiff] was, at times, not taking her medication due to insurance or cost issues." (internal citations omitted)), recommendation adopted, 2023 WL 5356209 (E.D.N.C. Aug. 21, 2023) (unpublished); McKoy v. Saul, No.

29

7:19CV223, 2020 WL 8084961, at *8 (E.D.N.C. Nov. 22, 2020) (unpublished) (finding error where, despite fact that "[s]everal records note[d] that [the plaintiff] experienced difficulty obtaining her medications because of insurance or financial issues," ALJ "did not explore the reasons why [the plaintiff] failed to take her medications as directed"), recommendation adopted, 2021 WL 76956 (E.D.N.C. Jan. 8, 2021) (unpublished); Daniels v. Berryhill, No. 4:18CV74, 2019 WL 2723694, at *5 (D.S.C. July 1, 2019) (unpublished) ("[A] determination that a claimant has been non-compliant does not end the analysis. . . . [W]here an ALJ relies on a claimant's non-compliance with prescription medications to support a denial of a disability claim, the ALJ must include an explanation or discussion of the reasons, supported by the record, for his determination that noncompliance indicates willful conduct.").

Plaintiff additionally asserts that "the ALJ cherry-picked 'normal' findings but the same records showed abnormal findings, in addition to ebbing and flowing symptoms." (Docket Entry 9 at 15.) By way of example, Plaintiff notes that the ALJ relied on page 744 of the administrative transcript for Plaintiff's report that she felt "'"relieved[ and] happy" in the present moment'" (id. (quoting Tr. 24-26 (in turn quoting Tr. 744))), but points out that "th[e] same [treatment] note indicates that "'[f]eelings of anxiousness, frustration, and sadness continue to challenge [Plaintiff]'s mood

30

stability'" (id. (quoting Tr. 744) (comma omitted)).  Moreover, Plaintiff observes that, "at her next visit with [Counselor] Motley, [Plaintiff] reported feeling 'edgy[ and] agitated[,]' . . . difficulty maintaining emotional boundaries[,] and racing thoughts" (id. (quoting Tr. 821)) and, "[a]t the next visit[,] . . . her medications needed adjusting" (id. at 15-16 (citing Tr. 820)).  In Plaintiff's view, her "[t]reatment notes show continued ups and downs" (id. at 16 (citing Tr. 807, 813)), but "[t]he ALJ failed to consider the waxing and waning of [Plaintiff]'s symptoms and instead implied sustained improvement by simply cherry-picking portions of treatment notes that supported a finding of non-disability while ignoring evidence that point[ed] to a disability finding."  (Id. (citing Lewis v. Berryhill, 858 F.3d 858, 867 (4th Cir. 2017)).)

Although the ALJ need not discuss every piece of evidence in his or her decision, see Reid v. Commissioner of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014), he or she "must both identify evidence that supports his [or her] conclusion and build an accurate and logical bridge from that evidence to [that] conclusion," Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (internal emphasis, quotation marks, and brackets omitted).  Moreover, the ALJ must "'consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability

31

finding.'"  <u>Lewis</u>, 858 F.3d at 869 (quoting <u>Denton v. Astrue</u>, 596 F.3d 419, 425 (7th Cir. 2010)).

Here, the ALJ relied on a <u>verbatim</u> summarization of Plaintiff's mental health treatment in assessing <u>all</u> of the mental opinion evidence, observing that "[m]ental health records note [Plaintiff] reported experiencing motivation to engage [sic] day to day life tasks[, ] increasing work time[,] . . . [and] mood stability[, ] described her mood as happy[, and ] denied flashbacks, feeling nervous or having panic attacks[,]" as well as that "[r]ecent records note [Plaintiff]'s report that she feels 'relieved, happy' and feel[s] 'pretty good, taking care of [her]self' in the present moment."  (Tr. 24-26 (citing Tr. 588-94; 605-06, 608-09, 616, 644, 649, 651, 658-59, 661-67, 744, 799, 801, 803, 805, 807, 813); <u>see also</u> <u>id.</u> (citing Tr. 351, 353, 377, 380, 383, 388, 392, 502, 596, 598, 600, 606, 610, 744, and 748 as reflecting "normal" mental status examinations).)

A closer examination of those records, however, does not support the ALJ's implicit assertion that Plaintiff showed sustained and consistent improvement in her motivation levels, mood stability, and PTSD/anxiety symptoms.  Indeed, although records existed reflecting stability or improvements in some of Plaintiff's mental symptoms (<u>see</u> Tr. 618, 622, 633, 647, 766 (stable mood), 649, 651, 744 (happy mood), 636, 643, 651, 811 (denying flashbacks, feeling nervous and/or panic attacks), 799 ("feeling 'pretty

32

good[,] taking care of [her]self,'" "<u>recently</u> finding the motivation to engage in cleaning and increased personal hygiene" (emphasis added))), more of the records cited by the ALJ show that Plaintiff continued to complain of <u>significant</u> mental symptoms (<u>see</u> Tr. 374 (increasing depression and anxiety due to home stress), 380 (smoking resumption due to stress, recommendation that Plaintiff see mental health provider for anxiety at next primary care visit), 388 (diagnosing increased anxiety and depression due to stressors, increasing Paxil dose), 596 ("feeling 'a little funny but okay,'" "increased instances of self-doubt"), 600 ("feeling 'a little wishy-washy[,] still stressed'"), 606 ("difficulty managing mood stability," "challenges following through with intentions when feeling escalated emotions," "fe[eling] like her mind and body were moving quickly"), 610 ("difficulty managing frustration," "bec[oming] verbally aggressive towards others," "fe[eling] like her mind and body were moving quickly[ and] hard to control"), 616 ("increased sadness and anxiousness," "impulsively talking to others and then regretting what [she said]," "fe[eling] like her mind and body were moving quickly"), 657-59 ("flashbacks" to past trauma, "panic/anxiety attack[s]," hearing voice called "'Marie,'" feeling "depressed," "overwhelmed," "'numb[,] and lost,'" reflecting Patient Health Questionnaire ("PHQ-9") score of 21 (severe depression)), 748 ("still stressed," "racing thoughts"), 801 ("depression on a daily basis," "anxiety [] 'through the

33

roof'"), 803 ("'very bleh[,] stressed,'" "difficulty managing anxiousness," "racing thoughts," "'compulsion to clean everything'"), 805 ("'overwhelmed,'" "difficulty managing anxiousness," "challenges maintaining hopefulness"), 807 ("'really stressed[,] sad[,] confused'")).[12]

---

[12] Notably, the ALJ neglected to cite to (much less discuss) many mental health treatment records that show (A) Plaintiff's ongoing, significant mental symptomatology, and (B) that any periods of improvement in her mental symptoms did not last. (See, e.g., Tr. 602 ("'very stressed and overwhelmed,'" "difficulty finding focus or motivation," "racing thoughts," "self-doubt and self-blaming," "'feeling confused about who [she is]'"), 604 ("difficulty managing racing thoughts," "constant internal script that [she] has difficulty slowing down or silencing," talks with "'personality separate from [her]self, Marie,'" experienced "a new personality 'that is really sarcastic and funny,'" "often felt like her mind and body were moving quickly"), 612 ("feeling 'off'," "increased instances of crying spells," "'feeling sad but there is nothing to feel sad over,'" "often felt unmotivated"), 620 ("feeling 'like [she is] falling apart[,] so sad and frustrated,'" "crying spells"), 626 ("feeling 'wishy-washy,'" "'anxiety about what to do next'"), 639 ("anxious and depressed mood," "increased self-doubt"), 641 ("increased anxiety," "mood swings," "days seeming to blur together"), 744 ("continued difficulty managing anxiousness," "racing thoughts"), 750 ("anxiety and occasional panic attacks"), 752 ("cleaning compulsions," "verbal aggression"), 756 ("very hyper, alert, overwhelmed, and very anxious," "'violently angry'"),758 ("'overwhelmed[,] extremely alert,'" "felt 'like things aren't real,'" "'fe[lt] like [she is] crazy,'" "crying spells that occur 'out of nowhere,'" "urge to 'become physical' with [her] child," "passive suicidal thoughts," "continued anxiousness and sadness," "difficulty accessing mood stability," "racing thoughts"), 762 ("'bouts of depression [that are] hard to get out of,'" "'mood swings,'" "irritable," "issues with concentrating," "loss of interests," "no motivation"), 764 ("'frustrated[,] angry,'" "continued anxiousness," "continued difficulty managing frustration," "challenges finding calmness"), 768 ("feels more anxious[] and depressed," "crying spells, poor focus[ and] concentration, is forgetful," "sad"), 772 ("feels more anxious," "flashbacks," "depressed," "sad," "[s]leeping more during the day and very little during the night"), 774 ("continued difficulty managing anxiousness," "challenges redirecting racing thoughts"), 775 ("'stressed'"), 776 ("'exhausted,'" "difficulty managing grief"), 782 ("feeling 'more down,'" "continued difficulty managing sadness," "increased feelings of grief"), 783 ("'anxious,'" "increased instances of anxiety attacks," "intrusive thoughts," "'feeling like [her] mood is switching,'" "resurfacing conversations with fragmented part of [her]self named 'Marie'"), 784 ("'emotionally drained,'" "continued difficulty managing intrusive thoughts," "increased self-doubt and racing thoughts"), 809 ("'stressed,'" "several moments of verbally 'going off' on [her house] guest," "continued difficulty managing anxiousness," "challenges coping with current life stressors"), 811 ("'back to smoking and rearranging cabinets'"), 815 ("continued difficulty managing frustration," "challenges coping with anger"), 817 ("'really frustrated,'" "continued difficulty managing frustration and anger," "challenges 'telling off' others at home," "increased instances of crying spells 'out of nowhere'"), 821 ("edgy, agitated,'" "continued difficulty managing anxiousness," "racing thoughts").) The ALJ's failure to discuss those records further supports

34

Moreover, contrary to the ALJ's assertion that "[t]he treatment notes of [Plaintiff's] treating practitioners usually showed that [her] mental status was <u>normal</u> at appointments" (Tr. 24-26 (emphasis added) (citing Tr. 351, 353, 377, 380, 383, 388, 392, 502, 596, 598, 600, 606, 610, 744, 748)), Plaintiff's mental health providers <u>consistently</u> described Plaintiff's mood and/or affect as "anxious," "tearful," and/or "depressed" (Tr. 596, 598, 600, 602-03, 604, 605-06, 610, 612, 614, 616, 618, 620, 622, 624, 626, 631, 633, 639, 641, 647, 649, 655, 744, 748, 752, 754, 758, 760, 764, 770, 774-77, 782-86, 799, 803, 805, 807, 809, 813, 815, 817, 821).[13]

Under such circumstances, the Court finds that the ALJ impermissibly cherrypicked the mental health evidence in order to discount all of the mental health evidence of record. <u>See</u> <u>Howe</u>, 2023 WL 5363719, at *5 ("[T]he ALJ's finding that [the plaintiff] did well with treatment fails to acknowledge the short-lived nature of [the plaintiff]'s improvement and her repeated relapses. In support of the conclusion that [the plaintiff] was doing well with treatment, the ALJ cited a treatment note from February 2018

---

the Court's conclusion that the ALJ "cherrypick[ed] facts that support[ed] a finding of nondisability while ignoring evidence that point[ed] to a disability finding," <u>Lewis</u>, 858 F.3d at 869 (internal quotation marks omitted).

[13] Transcript pages 351, 353, and 502 cited by the ALJ as showing "normal . . . mental status" (Tr. 24-26) contain treatment records from Plaintiff's orthopedic hand surgeon and pain management provider for Plaintiff's <u>CTS pain</u> (<u>see</u> Tr. 351, 353, 502), and, thus, the absence of significant psychiatric findings in those records does little to support the ALJ's assertion of "usually . . . normal" mental status examinations (Tr. 24-26).

35

indicating [the plaintiff] had normal mood and affect, and an April 29, 2019 discharge summary, at the end of a two week hospitalization after [the plaintiff] cut herself and attempted suicide by taking a handful of ibuprofen, that stated [the plaintiff] was 'doing well' and her affect seemed 'much brighter.' However, less than two months later in June 2019, [the plaintiff] presented to the emergency department as depressed and suicidal, she yelled and screamed at the provider, and she had to be restrained. The Fourth Circuit has reasoned, in the context of considering whether depression was disabling under the listings, that '[t]he waxing and waning of [a claimant's] symptoms would hinder her from being a dependable employee.' *Shelley C.*[ *v. Commissioner of Soc. Sec. Admin.*], 61 F.4th [341,] 368[ (4th Cir. 2023)]. Here, while [the plaintiff] at times showed improvement, it unfortunately was not a lasting improvement." (internal parenthetical citations omitted)).

With regard specifically to Counselor Motley's opinions, Plaintiff contests the ALJ's rationale that "'the issue of disability is reserved to the Commissioner.'" (Docket Entry 9 at 16 (quoting Tr. 25).) Plaintiff notes that she "do[es] not disagree with th[at] general premise[,]" but argues that "[Counselor] Moxley's [sic] statement that [Plaintiff] was not stable enough to return to work is not inconsistent with the limitations provided by the other providers that offered an

36

opinion." (Id.) Plaintiff, however, does not further explain her assertion that the other mental health opinions of record harmonize with Counselor Motley's opinion that Plaintiff remained too unstable to return to work (see id.), and the Court's review of those opinions actually demonstrates that no other provider offered such an opinion (see Tr. 77-78, 81-82, 87-88, 91-92, 103-04, 109-11, 120-21, 126-28, 512-14, 584, 588-93, 661-66).

Next, Plaintiff objects to the ALJ's rationale that the opinions of Drs. Hatfield and Hunt "'[we]re based on a one-time examination'" (Docket Entry 9 at 16 (quoting Tr. 26)), noting that "the opinions [of Drs. Hatfield and Hunt] were not inconsistent with the opinion[s of treating providers Dr. Stoudmire and Counselor Motley] or the [] opinions [of the state agency psychological consultants]," and that "no provider with a greater treatment relationship to [Plaintiff ] provided a contrary opinion" (id.). The regulations required the ALJ to consider the "[l]ength," "[f]requency," and "[e]xtent" of any opining medical source's relationship with Plaintiff, 20 C.F.R. §§ 404.1520c(c)(3), 416.920c(c)(3). Thus, the fact that Drs. Hatfield and Hunt based their opinions on a one-time examination held some relevance to "whether [they] ha[d] a longitudinal understanding of [Plaintiff's] impairments," 20 C.F.R. §§ 404.1520c(c)(3)(i), (ii), 416.920c(c)(3)(i), (ii). However, that fact, standing alone, did not provide substantial evidence to discount the opinions of Drs.

37

Hatfield and Hunt, given that, as Plaintiff points out (see Docket Entry 9 at 16), Plaintiff's treating mental health providers, Dr. Stoudmire and Counselor Motley, and the non-examining state agency psychological consultants all offered opinions similar to those of Drs. Hatfield and Hunt that Plaintiff's mental impairments caused primarily mild to moderate limitations in her ability to function mentally. (Compare Tr. 588-93, 661-66, with Tr. 77-78, 81-82, 87-88, 91-92, 103-04, 109-11, 120-21, 126-28, 512-14, 584.)

Additionally, Plaintiff faults the ALJ for discounting the opinions of Drs. Hatfield and Hunt as "'based primarily on [Plaintiff]'s subjective reports.'" (Docket Entry 9 at 16 (quoting Tr. 26).) According to Plaintiff, "[D]r. Hatfield specifically indicated that [] the results of his evaluation were based on [Plaintiff]'s 'self reports, data found in the records provided by the Commissioner, and clinical observation'" (id. at 17 (quoting Tr. 588)), and "Dr. Hunt indicated that he reviewed counseling records provided by the Commissioner and he elicited [Plaintiff]'s histories in addition to conducting a clinical evaluation" (id. (citing Tr. 661)).

With regard to Dr. Hatfield, his report supports his assertion that "[t]he results of []his evaluation [we]re based on [Plaintiff]'s self-report in addition to data found in records provided by [the SSA] and clinical observation." (Tr. 588 (emphasis added).) For example, Dr. Hatfield indicated under the

38

heading "Psychiatric History/History of Present Illness" (id. (bold and all-caps font omitted)) that he had reviewed the Stoudmire Assessment (see id.), as well as noted that Plaintiff "s[aw] a therapist . . . on a weekly basis, and a psychiatrist monthly with current prescriptions for [p]aroxetine . . . [and l]amotrigine . . ., with diagnoses of Borderline Personality Disorder, Depression, OCD, PTSD and . . . rule . . . out Bipolar Disorder" (Tr. 588-89). Although Dr. Hatfield's report does contain a lengthy list of Plaintiff's reported symptoms (see Tr. 589-90), Dr. Hatfield's mental status examination of Plaintiff revealed "[d]ysphoric" and "tearful" affect with a "[c]ongruent" mood" (Tr. 591). Moreover, although Dr. Hatfield noted normal speech and thoughts and generally intact memory (see id.), he also recorded Plaintiff's inability to "[c]ount backwards from 100 by 7s" (id.) and perform simple calculations, noting that Plaintiff "[c]ounted on her finger" and made "[f]requent requests to repeat items" (Tr. 592). Thus, Dr. Hatfield's opinions that Plaintiff "w[ould] likely have moderate difficulties utilizing sustained attention to perform routine, repetitive tasks" (id.), "forming and maintaining effective working relationships," and "tolerating the usual stress and pressures of a competitive workplace" (Tr. 593) cohere with his observations of Plaintiff's "[d]ysphoric" and "tearful" affect (Tr. 591), and of her "appear[ing] easily overwhelmed and tend[ing] to give up easily even on less difficult

39

problem solving tasks" (Tr. 592). The ALJ thus erred by discounting Dr. Hatfield's opinions, in part, on the ground that he "primarily" relied on Plaintiff's subjective symptom reports. (Tr. 26.)

Similar to Dr. Hatfield's report, Dr. Hunt's report reflects that he reviewed "progress notes from [the] Center for Emotional Health" where Plaintiff "was seen for counseling," and noted "[d]iagnoses [ of ] manic depression, PTSD, and panic disorder with the need to rule out dissociative identity disorder," as well as "[OCD]." (Tr. 662.) On mental status examination, although Dr. Hunt recorded Plaintiff's subjective symptoms (see Tr. 663), Dr. Hunt also documented an affect "with occasional tears" (id.), "[w]ithin [n]ormal [l]imits to [m]arginal" fund of information and calculations (Tr. 664-65 (emphasis added)) and "limited insight regarding psychological issues" (Tr. 665). Those findings supported Dr. Hunt's opinions that Plaintiff "could have moderate difficulty interacting effectively" and "moderate to marked difficulties tolerating [work] stress." (Tr. 666.) Accordingly, the ALJ erred by discounting Dr. Hunt's opinions, in part, on the ground that he "primarily" relied on Plaintiff's subjective symptom reports (Tr. 26).

Plaintiff additionally maintains that "the ALJ's decision does not show adequate consideration of the consistency of the opinion evidence; a factor the ALJ is required to not only consider, but

40

clearly articulate under the new regulation." (Docket Entry 9 at 18 (referencing 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2)).) In Plaintiff's view, "the ALJ [instead] provided an unsupported rejection of each opinion." (Id.)

Here, the ALJ provided the following, verbatim analysis of the mental health evidence in the record to discount all of the mental opinion evidence of record:

> Mental health records note [Plaintiff] reported experiencing motivation to engage [sic] day to day life tasks and increasing work time and also reported mood stability and described her mood as happy. She denied flashbacks, feeling nervous or having panic attacks. Recent records note [Plaintiff]'s report that she feels "relieved, happy" and feeling "pretty good, taking care of myself" in the present moment ([Tr. 588-94; 605-06, 608-09, 616, 644, 649, 651, 658-59, 661-67, 744, 799, 801, 803, 805, 807, 813]). . . . The treatment notes of her treating practitioners usually showed that [Plaintiff]'s mental status was normal at appointments ([Tr. 351, 353, 377, 380, 383, 388, 392, 502, 596, 598, 600, 606, 610, 744, 748]).

(Tr. 24-26 (emphasis added).) Although the ALJ did not expressly use the words consistent/inconsistent, that analysis could constitute a finding that the cited records lacked consistency with the mental opinions at issue. For the two reasons that follow, the ALJ's consistency analysis falls short

First, to the extent the ALJ cites to treatment records from a provider to discount that same provider's opinions (see Tr. 24-26), such an analysis addresses "supportability" rather than "consistency," see Revisions to Rules, 82 Fed. Reg. at 5853 (defining "[s]upportability" to mean "[t]he extent to which a

41

medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation" and "[c]onsistency" to mean "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim" (emphasis added)); see also 20 C.F.R. §§ 404.1520c(c), 416.920c(c); Witt v. Kijakazi, No. 1:21CV881, 2023 WL 1869271, at *5 (M.D.N.C. Jan. 4, 2023) (unpublished) (Webster, M.J.) ("Supportability is an internal check that references objective medical evidence and supporting explanations that come from the source itself. Consistency is an external check that references evidence from other medical and nonmedical sources." (emphasis added)), recommendation adopted, 2023 WL 1864313 (M.D.N.C. Feb. 9, 2023) (unpublished) (Osteen, J.). As the ALJ included the same string citations to record evidence in all of her evaluations of the mental opinion evidence, it remains unclear to the Court if the ALJ even intended to make a consistency finding. In addition, although the ALJ included a citation to the examinations of Drs. Hatfield and Hunt in her string citation (see Tr. 24-26 (citing Tr. 588-94, 661-67)), the narrative discussion preceding that citation does not specifically discuss any findings from those consultative examinations (see id.).

Second, and more significantly, the ALJ failed to discuss the significant consistency that existed between all of the mental health opinion evidence in the record. (See Tr. 24-26.) All of

42

those opinions agree that Plaintiff had <u>mild to moderate</u> limitations in functioning arising from her mental impairments, especially in the areas of interaction and stress tolerance.  (<u>See</u> Tr. 77-78, 81-82, 87-88, 91-92, 103-04, 109-11, 120-121, 126-28, 512-14, 584, 588-93, 661-66.)  The ALJ's determinations that Plaintiff's mental impairments qualified as <u>non-severe</u> (<u>see</u> Tr. 18-19) and caused <u>no</u> limitations in her RFC (<u>see</u> Tr. 20) stand alone against those other, consistent mental opinions.

In sum, the ALJ improperly discounted the mental opinion evidence of record in that the ALJ 1) found that Plaintiff stopped taking psychiatric medication on her own without considering her inability to afford such medication, 2) cherrypicked the findings in the treatment evidence supporting nondisability while ignoring substantial evidence supporting disability, 3) erroneously discounted the opinions of Drs. Hatfield and Hunt as "primarily" relying on Plaintiff's subjective reports, and 4) failed to provide a sufficient consistency analysis, collectively rendering that analysis unsupported by substantial evidence and warranting remand.

2.    <u>Opinions Relating to Plaintiff's Manipulative Limitations</u>

a.    State Agency Medical Consultants

The initial-level state agency medical consultant found that Plaintiff's CTS limited her to <u>frequent handling</u> with the right upper extremity.  (<u>See</u> Tr. 80, 90.)  Upon reconsideration, a different consultant limited Plaintiff to <u>occasional handling,</u>

fingering, and feeling with the right upper extremity.  (See Tr. 109, 126.)  Despite the differences between those opinions, the ALJ assessed them together and assigned the same persuasive value to them, as follows:

> The [ALJ] finds th[o]se opinions partially persuasive because they are consistent with the objective evidence. However, th[o]se[] opinions found [Plaintiff] could do no more than occasional handling and fingering [sic], while the evidence does not support th[at] degree of limitation and recent treatment notes indicate a mildly positive median nerve percussion and compression test.  She can make a full fist and extend the digits fully on the right.  On the left she has a positive median nerve percussion and compression test.  Notably, the examiner indicates they do not have a great explanation for [Plaintiff]'s continued right wrist and arm pain.  [Plaintiff] now wants to live with the carpal tunnel on the left.  In addition[,] the examiner indicates they do not have a great explanation for [Plaintiff]'s continued right wrist and arm pain ([Tr. 826-27]).

(Tr. 24.)

b.  Dr. Bolstad

Dr. Bolstad completed a preprinted form (Tr. 489-90) entitled "Physical Assessment" (Tr. 489 (bold and all-caps font omitted)) on January 19, 2021 (see Tr. 490), on which he listed Plaintiff's diagnosis as "[CTS], right wrist" (Tr. 489).  According to Dr. Bolstad, Plaintiff's CTS limited her to no use of her right upper extremity for grasping, turning, twisting, and fine manipulation, and reaching for 30 percent of a work day (see id.).  The ALJ

44

evaluated the persuasiveness of Dr. Bolstad's opinion in the following manner:

> The [ALJ] finds this opinion partially persuasive . . . . Dr. Bolstad is not familiar with Social Security Rules and Regulations or with the medical evidence of record. . . . Nerve conduction studies/EMG findings are consistent with mild right median neuropathy of the right wrist and moderate left median neuropathy ([Tr. 681-82]). [Plaintiff] underwent right revision carpal tunnel release and she reported her digital motion is much better and her pain had improved significantly. She was able to form a loose fist and touch fingertips to palm. She had full range of motion of the right elbow ([Tr. 691-92]). Notably, [Plaintiff] reported in September 2023 [sic] that she is a hairdresser and has been out of work since May ([Tr. 697]). Recent treatment notes note . . . a mildly positive median nerve percussion and compression test. She can make a full fist and extend the digits fully on the right. On the left she has a positive median nerve percussion and compression teat. Notably, the examiner indicates they do not have a great explanation for [Plaintiff]'s continued right wrist and arm pain. [Plaintiff] now wants to live with the carpal tunnel on the left ([Tr. 826-27]).

(Tr. 24-25 (some internal parenthetical citations omitted).)

c. Dr. Burgess

On August 22, 2022, Dr. Burgess conducted a consultative medical examination of Plaintiff. (Tr. 669-78.) Dr. Burgess found "strongly positive" Tinel's sign, "positive" Phalen's sign, "tenderness, redness, warmth and swelling of [Plaintiff's] right hand, particularly the thenar and hypothenar areas," and noted that Plaintiff could make a "tight[er]" fist with her left hand than her right hand. (Tr. 671.) In addition, Dr. Burgess observed that Plaintiff "had a lot of trouble [writing and picking up coins] with

45

the right hand," recorded decreased "5-/5" strength in Plaintiff's distal left arm and "4-4+/5" strength in her distal right arm. (Tr. 672.)  Dr. Burgess assessed "[CTS] with failed surgery and now nerve damage," and "possible chronic regional pain syndrome (CRPS)," opining that "[Plaintiff] has what appears to be a significant uptick in symptoms following surgery with symptoms that are consistent with CRPS," as well as that, "at a minimum[,] significant nerve damage is noted . . . [in her] dominant [right] hand."  (Tr. 673 (emphasis added).)  As a result of that assessment, Dr. Burgess believed that Plaintiff's CTS/CRPS caused "moderate[] impair[ment]" in her abilities to lift, carry, push, and pull.  (Id.)  The ALJ "f[ound] th[at] opinion not persuasive because the term 'moderate' [wa]s vague and Dr. Burgess d[id] not identify the degree to which any impairment of [Plaintiff] affect[ed her] ability to perform (in terms compliant with the policies of the [SSA]) any vocationally relevant activities." (Tr. 25.)

Plaintiff attacks the ALJ's analysis of those opinions on two grounds.  (Docket Entry 9 at 25-27.)  For the following reasons, both of those grounds have merit and provide an additional basis for remand.

Plaintiff first deems the ALJ's evaluation of the opinions at issue "unreasonable" (id. at 25), because "the ALJ [] 'cherry pick[ed] facts that support[ed] a finding of nondisability while

46

ignoring evidence that point[ed] to a disability finding'" (id. (quoting Bilotta v. Saul, 850 F. App'x 162, 169 (4th Cir. 2021))). In that regard, Plaintiff maintains that "the ALJ did not present a[] fair citation to [Plaintiff's June 12, 2023,] evaluation [by Plaintiff's hand surgeon Dr. Walter Harrill Wray, III]," because the ALJ omitted mention of a "discussion [between Dr. Wray and Plaintiff] of the fact that [she] had [two] prior right-sided carpal tunnel releases so that [Dr. Wray] was not confident that a repeat surgery on the right would be significantly helpful." (Id. at 25-26 (citing Tr. 824-29).) Plaintiff additionally points out that "[Dr. Wray] did not indicate that he disbelieved [Plaintiff]'s complaints," and "noted that left-sided carpal tunnel release was an option but also noted that [Plaintiff]'s husband [sic] was present and 'quite opinionated' about additional surgery." (Id. at 26.) According to Plaintiff, "[t]his examination simply does not disprove the consistent opinion evidence supporting that [Plaintiff] would be limited to occasional handling, fingering, or reaching; a limitation that would preclude all work in addition to her other limitations." (Id. (citing Tr. 71 (reflecting VE's testimony that no jobs would exist for individual limited to light work and occasional, bilateral handling and fingering)).)

The record confirms that the ALJ cherry-picked evidence supporting a nondisability finding in order to discount the opinions of the state agency medical consultants and Dr. Bolstad.

47

The ALJ observed that "[r]ecent treatment notes note . . . a mildly positive median nerve percussion and compression test[ on the right], that Plaintiff] can make a full fist and extend the digits fully on the right[, and] . . . a positive median nerve percussion and compression test [on the left]."  (Tr. 24-25 (emphasis added) (referencing and citing Tr. 826-27).)  Despite the ALJ's reference to "treatment notes" (id. (emphasis added)), the ALJ cited only one treatment note, i.e., the June 12, 2023, office visit with Dr. Wray, in support of those observations (see id.).  More critically, the ALJ failed to acknowledge that Plaintiff also "continue[d] to struggle[ with b]urning pain along the incision[,] numbness and tingling in the fingers[,] finger stiffness[,] whole arm pain[, and] continued left hand numbness and tingling" (Tr. 824-25).  The ALJ thereafter found "[n]otabl[e]" that Dr. Wray "indicate[d] they [sic] d[id] not have a great explanation for [Plaintiff]'s continued right wrist and arm pain," and that "[Plaintiff ] want[ed] to live with the carpal tunnel on the left" (Tr. 25 (citing Tr. 826-27)), but, as Plaintiff points out (see Docket Entry 9 at 25-26), the ALJ failed to recognize that Dr. Wray expressed no doubt regarding the veracity of Plaintiff's reported symptoms and skepticism that additional surgery would benefit her (see Tr. 824-29), that Plaintiff had already experienced two failed carpal tunnel releases on the right, and that her partner attended

48

the appointment and provided a very strong opinion against surgery, (see Tr. 827).

The ALJ engaged in similar cherry-picking with regard to other CTS treatment notes discussed.  For example, the ALJ observed that "[Plaintiff] underwent right revision carpal tunnel release[, ] she reported her digital motion [wa]s much better and her pain had improved significantly[, s]he was able to form a loose fist and touch fingertips to palm[, and s]he had full range of motion of the right elbow" (Tr. 24 (citing Tr. 691-92)), but the ALJ neglected to mention that Plaintiff also reported "some pain with forming a fist" and "burning pain located at the medial elbow" (Tr. 691), as well as that Dr. Wray noted tenderness at the incision, "within the thenar and hypothenar aspects of the palm," and "over the medial epicondyle" (Tr. 692).  Additionally, the ALJ found "[n]otabl[e]" that "[Plaintiff] reported in September 2023 [sic] that she [wa]s a hairdresser and ha[d] been out of work since May [2022]" (Tr. 24 (citing Tr. 697)), but did not provide any explanation why the fact that Plaintiff could no longer perform hair cutting services for even six hours per week due to her "[inability] to hold onto [her] clippers and [her] trimmers" because "[t]he vibration cause[d her] hands to burn[ and] ma[de] it very difficult to hold onto things" (Tr. 53) would undercut Dr. Bolstad's opinions.[14]

---

[14] The ALJ additionally stated that "Dr. Bolstad is not familiar with Social Security Rules and Regulations or with the medical evidence of record." (Tr. 24.)  The ALJ, however, did not clarify why either of those facts held any relevance to the persuasiveness of Dr. Bolstad's opinions.  (See id.)  Dr.

Second, Plaintiff faults the ALJ for "not show[ing] adequate consideration of the consistency of the opinion evidence [relating to Plaintiff's manipulative limitations]; a factor the ALJ is required to not only consider, but clearly articulate under the new regulations." (Docket Entry 9 at 26.)  In Plaintiff's view, "the ALJ [instead] provided an unsupported rejection of each opinion." (Id.)  As discussed in more detail below, the ALJ failed to provide a sufficient consistency analysis for any of the opinions at issue.

To begin, the ALJ improperly analyzed the opinions of the initial and reconsideration level state agency medical consultants together and assigned them one persuasiveness value, i.e., "partially persuasive" (Tr. 24), incorrectly noting that both "opinions found [Plaintiff] could do no more than <u>occasional handling and fingering</u>" (<u>id.</u> (emphasis added)).  In fact, those opinions do not harmonize with each other regarding manipulative limitations.  The initial-level consultant limited Plaintiff only to <u>frequent handling with the right upper extremity</u> (<u>see</u> Tr. 80, 90), and the reconsideration-level consultant restricted Plaintiff to <u>occasional handling, fingering, and feeling with the right upper extremity</u> (<u>see</u> Tr. 109, 126).  The ALJ's RFC limits Plaintiff to

---

Bolstad treated Plaintiff for her right-sided CTS (<u>see</u> Tr. 340-53), performed a carpal tunnel release on Plaintiff's right arm in October 2020 (<u>see</u> Tr. 350-51), and offered his opinions about the impact of Plaintiff's CTS on her ability to perform manipulative functions in January 2021 (<u>see</u> Tr. 489-90).  Thus, Dr. Bolstad would not need familiarity with "Social Security Rules and Regulations" or with "the [other] medical evidence of record" (Tr. 24) to offer opinions regarding Plaintiff's manipulative abilities.

frequent bilateral handling and fingering (see Tr. 20), and, thus, contains greater manipulative restrictions than the initial-level consultant found (compare Tr. 20, with Tr. 80, 90), but the ALJ, in discounting both consultants' opinions, provided only reasons supporting lesser manipulative restrictions (see Tr. 24). Moreover, in discounting the opinion of the reconsideration-level consultant, the ALJ failed to discuss the consistency of that consultant's opinion with Dr. Burgess's significant findings regarding Plaintiff's right hand of positive Tinel's and Phalen's signs, tenderness, redness, warmth, swelling, decreased strength, and difficulty writing and picking up coins (see Tr. 671-72), and Dr. Burgess's assessment of significant nerve damage and symptoms consistent with CRPS in Plaintiff's right hand (see Tr. 673). (See Tr. 24.)

In assessing Dr. Bolstad's opinion, the ALJ failed to properly assess consistency because, as discussed above, she cited primarily to cherry-picked findings from Dr. Wray's records. (See Tr. 24-25.) Moreover, the ALJ again failed to address the consistency with Dr. Bolstad's opinions of Dr. Burgess's above-described examination findings and assessments regarding Plaintiff's right hand (see Tr. 671-73). (See Tr. 24.)

Lastly, the ALJ's rejection of Dr. Burgess's opinions depends entirely on the ALJ's characterization of Dr. Burgess's use of the term "moderate[]" to describe Plaintiff's level of impairment (Tr.

51

673) as "vague." (Tr. 25.) The ALJ's analysis <u>entirely omits</u> a consistency analysis in violation of the application regulations, <u>see</u> 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). (<u>See</u> <u>id.</u>)

In short, the ALJ failed to support with substantial evidence her analyses of the opinions of the state agency medical consultants, Dr. Bolstad, and Dr. Burgess regarding Plaintiff's manipulative limitations, providing an additional basis for remand.

### III. CONCLUSION

Plaintiff has established errors warranting remand.

**IT IS THEREFORE ORDERED** that the Commissioner's decision finding no disability is **VACATED,** and that this action is **REMANDED** under sentence four of 42 U.S.C. 405(g) for further administrative proceedings, to include 1) re-evaluation of the opinions of the state agency psychological consultants, Dr. Stoudmire, Counselor Motley, Dr. Hatfield, and Dr. Hunt regarding Plaintiff's mental limitations in accordance with 20 C.F.R. §§ 404.1520c, 416.920c, <u>Lewis</u>, 858 F.3d at 867, <u>Lovejoy</u>, 790 F.2d at 1117, and SSR 16-3p, and 2) re-evaluation of the opinions of the state agency medical consultants, Dr. Bolstad, and Dr. Burgess regarding Plaintiff's manipulative limitations in accordance with 20 C.F.R. §§ 404.1520c, 416.920c and <u>Lewis</u>, 858 F.3d at 867.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

March 17, 2026